

JUDGE GARDEPHE

11 CIV 4220

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL
ASSOCIATION, as Indenture Trustee,

   Interpleader Plaintiff,

– against –

WELLS FARGO BANK, NATIONAL
ASSOCIATION; LACROSSE FINANCIAL
PRODUCTS, LLC; MBIA INSURANCE
CORPORATION; and MASSACHUSETTS
FINANCIAL SERVICES COMPANY, d/b/a MFS
Investment Management,

   Interpleader Defendants.

Case No._____

---

## INTERPLEADER COMPLAINT

Plaintiff U.S. Bank National Association ("U.S. Bank"), as successor to Bank of America, National Association ("Bank of America"), in its capacity as trustee (the "Trustee") under the Indenture dated as of April 12, 2007 (the "Indenture"), by and among Lenox Street 2007-1 CDO, Ltd., as issuer (the "Issuer"), Lenox Street 2007-1, LLC, as co-issuer, and the Trustee, by its undersigned attorneys, for its Interpleader Complaint, alleges as follows:

### NATURE OF THE ACTION

1. This is an interpleader action pursuant to 28 U.S.C. §1335(a) for the purpose of obtaining adjudication of the rights of the Interpleader Defendants with respect to certain funds, as described further below, to which the Interpleader Defendants are claiming or may claim to be entitled (the "Disputed Funds"), and for obtaining adjudication of any one or more of the benefits arising by virtue of any policy or other instrument in connection with the transaction described in

this Complaint.[1]  U.S. Bank, which serves as Trustee under the Indenture, faces competing demands by the Interpleader Defendants with respect to the transfer of the Disputed Funds and due to the assertion by the Interpleader Defendants of certain rights relating to such funds.  To adequately preserve the status quo with respect to the Disputed Funds and the Interpleader Defendants' claims, U.S. Bank has to date transferred the Disputed Funds in accordance with the directions of the Collateral Manager and will continue to do so unless otherwise directed by the Court.  However, U.S. Bank cannot determine, without hazard to itself, how to proceed in the future in the absence of a Court order resolving the conflicting demands being made upon it.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1335 because it is a civil action of interpleader or in the nature of interpleader, two or more adverse claimants are of diverse citizenship, and the amount in controversy exceeds $500.

3.  Venue in this district is proper under 28 U.S.C. § 1397 because one or more defendants reside within this judicial district.

## THE PARTIES

4.  U.S. Bank is a national banking association with its main office in Cincinnati, Ohio.  LaSalle Bank National Association ("LaSalle") was the Trustee under the Indenture.  In October 2008, LaSalle merged with and into Bank of America, with Bank of America as the surviving entity.  In January 2011, U.S. Bank succeeded to Bank of America as the Trustee under the Indenture.

_____

[1] All capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Indenture and the Wells Fargo Credit Default Swap (as defined below).  U.S. Bank is required to keep the Indenture confidential pursuant to Section 14.14 of the Indenture and will provide a copy to the Court and any interested Interpleader Defendants upon entry of an appropriate Protective Order.

5. Upon information and belief, Interpleader Defendant Wells Fargo Bank, National Association ("Wells Fargo"), is a national banking association with its main office in Sioux Falls, South Dakota. Wells Fargo (as successor to Wachovia Bank, National Association) entered into a credit default swap agreement with the Issuer which is evidenced by an ISDA Master Agreement, the Schedule thereto, and a confirmation—each dated as of April 12, 2007— and various letters of execution entered into between Wells Fargo and the Issuer pursuant to the Schedule (collectively, the "Wells Fargo Credit Default Swap").

6. Upon information and belief, Interpleader Defendant LaCrosse Financial Products, LLC ("LaCrosse") is a Delaware limited liability company with a principal place of business in Armonk, New York. Upon information and belief, LaCrosse was established in 1999 to act as counterparty for structured derivative products, primarily credit default swap agreements. Although Interpleader Defendant MBIA Insurance Corporation ("MBIA") does not directly own LaCrosse, LaCrosse's assets and liabilities are consolidated in MBIA's financial statements on the basis that MBIA, by means of financial guaranty insurance policies, guarantees the obligations of LaCrosse under LaCrosse's credit default swap agreements. LaCrosse has entered into a credit default swap agreement with the Issuer, which is evidenced by an ISDA Master Agreement, the Schedule thereto, and a confirmation, each dated as of April 12, 2007 (collectively, the "Super Senior Swap").

7. Upon information and belief, Interpleader Defendant MBIA is a New York corporation with its principal place of business in Armonk, New York. MBIA is the Super Senior Guarantor under a financial guaranty insurance policy, dated as of April 12, 2007 (the "Super Senior Guaranty"), guaranteeing the payment obligations of LaCrosse under the Super Senior Swap.

3

8. Upon information and belief, Interpleader Defendant Massachusetts Financial Services Company ("MFS Investment Management") is a Delaware corporation with a principal place of business in Boston, Massachusetts. MFS Investment Management is the Collateral Manager under a Collateral Management Agreement, dated as of April 12, 2007, among the Issuer, the Collateral Manager, and U.S. Bank in its role as Collateral Administrator under the Collateral Administration Agreement.

## BACKGROUND

9. Pursuant to the Indenture, the Issuer and the Co-Issuer issued several classes of Notes. The Notes are secured by a pool of Collateral, which consists of Cash Assets (*i.e.*, asset-backed securities), Synthetic Assets (*i.e.*, credit default swap agreements), and other assets and accounts. The Collateral includes all payments and proceeds received in respect of such securities, credit default swap agreements, and other assets and accounts; and the Issuer's rights under various Transaction Agreements, including the Wells Fargo Credit Default Swap, the Super Senior Swap, the Super Senior Guaranty, the Collateral Management Agreement, and the Collateral Administration Agreement.

10. Pursuant to the Indenture, the Issuer pledged the Collateral to U.S. Bank, in its capacity as a Trustee, to secure the Issuer's obligations under the Indenture, the Wells Fargo Credit Default Swap, the Super Senior Swap, and certain other agreements set forth in the Indenture. U.S. Bank holds the Collateral on behalf of the secured parties under the Indenture and receives the proceeds payable in respect thereof. Payments received in respect of such Collateral are applied by the Trustee to pay, among other things, to the Noteholders the debt service on the Notes, and to make certain periodic and other payments to Wells Fargo under the Wells Fargo Credit Default Swap and to LaCrosse under the Super Senior Swap.

4

11. The Indenture contains several provisions setting forth the priority of payment for the application of funds held under the Indenture (the "Priority of Payments Provisions"). Under the Priority of Payment Provisions, Wells Fargo is entitled to be paid any unpaid CDS Interest Payments (as described below) prior to the payment to LaCrosse of the Super Senior Swap Premium Payment (also as described below). The Senior Collateral Management Fee, including any portion thereof deferred on a prior Distribution Date up to a fixed amount, is payable under the Priority of Payment Provisions after the payment of the CDS Interest Payments but prior to the payment of the Super Senior Swap Premium Payment.

12. Under the Wells Fargo Credit Default Swap, Wells Fargo is required to make certain periodic fixed payments to the Issuer (each, a "Wells Fargo Swap Premium Payment"), in consideration for the Issuer paying to Wells Fargo certain amounts, including CDS Interest Payments in respect of CDS Interest Shortfalls.

13. Under the Super Senior Swap, the Issuer is required to make certain periodic fixed payments to LaCrosse (each, a "Super Senior Swap Premium Payment"), in consideration for LaCrosse paying to the Issuer on the Termination Date of the Super Senior Swap Agreement an amount equal to the Net Senior Credit Protection Payment. The "Net Senior Credit Protection Payment" is defined in the Indenture to include, subject to a threshold amount, certain amounts owed to Wells Fargo in its capacity as counterparty under the Wells Fargo Credit Default Swap.

14. Any failure by the Issuer to make the Super Senior Swap Premium Payment to LaCrosse entitles LaCrosse to terminate the Super Senior Swap on an Early Termination Date. Upon any such termination, the Schedule to the Super Senior Swap provides that neither party

5

will be required to make a termination payment to the other party, except for amounts that were due and payable prior to the Early Termination Date.

15. The Issuer is a special-purpose vehicle that was formed solely for the purpose of issuing the Notes and acquiring the Collateral Assets. The Issuer has no employees and relies on the Collateral Manager to monitor the Collateral Assets and to perform, on behalf of the Issuer, duties delegated to the Collateral Manager in the Collateral Management Agreement, the Indenture, and certain other Transaction Agreements.

16. In particular, the Collateral Manager is required by the Collateral Management Agreement to (i) monitor the Wells Fargo Credit Default Swap and the Super Senior Swap and advise the Issuer whether and when to exercise any of its rights thereunder, and (ii) direct the Issuer to make payments, settlements, and deliveries permitted or required pursuant to the Wells Fargo Credit Default Swap and the Super Senior Swap in accordance with the procedures set forth in the Indenture.

17. An Event of Default occurred under the Indenture on November 27, 2009, pursuant to Section 5.1(j) of the Indenture, as a result of a decrease in the value of Collateral.

18. LaCrosse is the Controlling Class under the Indenture and is entitled to exercise certain rights in such capacity. On information and belief, LaCrosse has assigned its rights as the Controlling Class under the Indenture to MBIA.

19. On May 9, 2011, the Trustee received a letter from MBIA (the "MBIA First Letter"). In the MBIA First Letter, MBIA asserted that (i) Wells Fargo breached its obligations as Calculation Agent under the Wells Fargo Credit Default Swap in calculating Interest Shortfall

6

Payments Amounts for certain Distribution Dates, (ii) the use of funds held in the Reserve Account by the Collateral Manager (acting on behalf of the Issuer) to pay Interest Shortfall Payment Amounts owed to Wells Fargo under the Credit Default Swap breached the terms of the Indenture, and (iii) the Collateral Manager acted improperly in purportedly taking direction from Wells Fargo in connection with the Collateral Manager's designation of funds held in the Expense Account as Interest Proceeds. The MBIA First Letter also "requests" that the Collateral Manager cease to make such designation in the future.

20. The Trustee circulated a notice to the Issuer, the Collateral Manager, Wells Fargo, and MBIA, dated May 23, 2011, in which the Trustee described the issues raised in the MBIA First Letter and solicited the views of the addressees in respect of such issues (the "Trustee First Notice"). The Trustee requested that comments be submitted to it by no later than June 15, 2011.

21. On May 24, 2011, Wells Fargo delivered a notice to the Trustee and other parties to the transaction in which Wells Fargo waived its rights to certain Interest Shortfall Payment Amounts under the Wells Fargo Credit Default Swap that would otherwise have been payable on May 26, 2011 (the "Wells Fargo Waiver Letter"). The Trustee forwarded a copy of the Wells Fargo Waiver Letter to the same addressees to which the Trustee First Notice had been previously furnished. This notice from the Trustee regarding the Wells Fargo Letter is herein referred to as the "Trustee Second Notice."

22. On May 26, 2011, the Collateral Manager delivered a notice to the Issuer and the Trustee of its election under Section 8 of the Collateral Management Agreement to defer fees in an amount equal to $114,325.71 that would otherwise have been payable on the June 2011 Distribution Date.

7

23. One of the effects of the waiver of Interest Shortfall Payment Amounts by Wells Fargo described in paragraph 19 and the deferral of the fee by the Collateral Manager described in paragraph 20, was to assure that there would be sufficient funds in the Indenture Accounts on the Distribution Date occurring on June 6, 2011 (the "June 2011 Distribution Date") to make the Super Senior Swap Premium Payment due to LaCrosse on such date.

24. On May 26, 2011, MBIA delivered a second letter to the Trustee in response to the Trustee First Notice (the "MBIA Second Letter"), in which MBIA contended that (i) the sending of the Trustee First Notice "did not comport with the Trustee's duties and obligations" under the Indenture, and (ii) if the Trustee "permits any additional breaches . . . to occur, the Trustee will be in plain violation of its standard of care set forth in . . . the Indenture." MBIA also asserted that it was exercising its right as the Controlling Class under the Indenture to direct the Trustee to make an investigation into the purported breaches of the Transaction Agreements.

25. On June 3, 2011, in response to the receipt of the Trustee Second Notice which had the Wells Fargo Waiver Letter attached to it, MBIA delivered a third letter to the Trustee (the "MBIA Third Letter"), in which MBIA contended that the waiver by Wells Fargo should not be given effect because it failed to comply with the waiver provisions of the Wells Fargo Swap Agreement.

26. On June 6, 2011, Wells Fargo delivered a letter to the Trustee (the "Wells Fargo Response") in which it referenced all three of the MBIA letters, and addressed the assertions made by MBIA in such letters. Wells Fargo disputed each of the substantive assertions made by MBIA in such letters. Wells Fargo further contended that the Issuer and the Trustee are obligated to act to preserve the security interest granted to Wells Fargo under the Wells Fargo

8

Swap Agreement and the Indenture, which Wells Fargo indicated can only be done by endorsing the position of Wells Fargo rather than that of MBIA in its three letters.

27. On June 9, 2011, the Collateral Manager sent an e-mail to the Trustee (the "Collateral Manager Response") in which it referenced the MBIA First Letter and disagreed with the positions of MBIA set forth therein. With respect to the only issue raised by MBIA directly involving the conduct of the Collateral Manager, the Collateral Manager stated in the Collateral Manager Response that the relevant provision of the Indenture "plainly permits" the Collateral Manager, at its option and "in its sole discretion," to designate amounts in the Expense Account as Interest Proceeds or Principal Proceeds, and that it exercised its discretion appropriately in designating certain funds in the Expense Account as Interest Proceeds. The Collateral Manager also denied MBIA's allegation that the Collateral Manager improperly acted at the direction of Wells Fargo in making such designation with respect to the December distribution.

28. On June 14, 2011, MBIA delivered a fourth letter to the Trustee (the "MBIA Fourth Letter") in which it disputed each of the substantive assertions made by Wells Fargo in the Wells Fargo Response. The MBIA Fourth Letter also reiterated MBIA's direction to the Trustee to undertake an investigation with respect to the issues raised by MBIA in its various letters.

29. In view of the diametrically opposed positions of MBIA, on the one hand, and Wells Fargo and the Collateral Manager, on the other hand; the lack of sufficient factual information to assess the merits of the Interpleader Defendants' respective positions; and certain ambiguities in the Transaction Agreements, U.S. Bank is unclear as to how to proceed in the future in respect of its duties under the Transaction Agreements. U.S. Bank has identified four

9

disputes with respect to which it seeks this Court's guidance. The four disputes are intertwined and have serious financial implications for the parties involved, the full parameters of which cannot be currently ascertained. The disputes are detailed below.

## THE FIRST DISPUTE

30. The first dispute concerns MBIA's assertion that Wells Fargo, in its capacity as Calculation Agent, failed on a timely basis to make the required calculations under the Wells Fargo Credit Default Swap and/or to provide calculation notices with respect to the Interest Shortfall Payment Amounts (the "November Interest Shortfalls") for the Fixed Rate Payer Payment Date that fell on November 25, 2010 (the "Applicable Fixed Rate Payer Payment Date").

31. According to the MBIA First Letter, as a result of Wells Fargo's failure to make the required calculations and/or to provide calculation notices with respect to the November Interest Shortfall "the related Interest Shortfall Amounts did not become due on the Applicable Fixed Rate Payer Payment Date."

32. MBIA also claims in the MBIA First Letter that Wells Fargo took "similar violative action" with respect to Interest Shortfall Payment Amounts related to the February 25, 2011 Fixed Rate Payer Payment Date (the "February Interest Shortfalls").

33. In addition, MBIA contends that such actions were deliberately taken by Wells Fargo "to manipulate the amount of Interest Proceeds available to the Issuer." MBIA asserts in this regard that such actions by Wells Fargo breached its obligations to make the calculations with respect to the November Interest Shortfalls and the February Interest Shortfalls under the

10

Wells Fargo Credit Default Swap "as soon as practicable" after obtaining the related Servicer Reports and to act "in good faith and in a commercially reasonable manner."

34. MBIA requests in the MBIA First Letter that the Trustee "take action to cure the breaches of the Relevant Documents" described above. MBIA asserts in the MBIA Second Letter that if the Trustee "permits any additional breaches . . . to occur, the Trustee will be in plain violation of its standard of care set forth in . . . the Indenture."

35. In the Wells Fargo Response, Wells Fargo vigorously disputes the contentions of MBIA in respect of its performance as Calculation Agent, stating that "[w]e reject MBIA's assertion and consider it to be baseless." Wells Fargo also notes that "[w]e expect the Issuer and the Trustee will act to preserve the security interest granted [to it] under both the Wells Fargo ISDA Master Agreement and the Indenture."

36. The legal issue framed by the conflicting positions of MBIA and Wells Fargo is whether Wells Fargo acted "in a good faith and in a commercially reasonable manner" in calculating the Interest Shortfall Payment Amounts on the relevant Distribution Dates. Such issue requires a number of difficult determinations to be made. The responses received from the interested parties to the Trustee First Notice provide no basis to make these determinations. Moreover, even if the facts were fully known by the Trustee, the legal determinations required to resolve these issues are not of the type that trustees are called upon to make, particularly when the legal issue involves disputed factual issues and no precedents to provide guidance.

37. The first dispute has potentially significant financial implications for the parties. If MBIA's position is sustained, the payments required to be made by the parties under the Wells Fargo Credit Default Swap will be required to be made in the future on the same day, which will

11

mean that under the terms of the Wells Fargo Credit Default Swap the two payments will be netted out to zero. The Trustee understands that the result of such netting would be to deplete the funds in the Indenture Accounts so that there would not be sufficient funds to make the Super Senior Swap Premium Payment to LaCrosse. As noted above, any failure to make such payment would entitle LaCrosse to terminate the Super Senior Swap without having to make any termination payment to the Issuer. On information and belief, we understand that the Issuer is currently significantly "in-the-money" under the Super Senior Swap Agreement (that is, the Issuer would be entitled to receive a significant Net Senior Credit Protection Payment on the Termination Date of the Super Senior Swap Agreement). Any such payment would inure to benefit of certain parties to the transaction, including Wells Fargo, through payments made to them under the Priority of Payment Provisions.

38. Accordingly, the first dispute involves a clear conflict among the Interpleader Defendants that has significant economic consequences for this transaction. Each of MBIA and Wells Fargo have also indicated in writing to the Trustee that their respective views are that the Trustee is obligated pursuant to the Terms of the relevant Transaction Agreements to take the actions that each of them has directed or requested. Those directions from MBIA and Wells Fargo are directly conflicting, however, and for that reason the Trustee requests that the Court resolve this dispute among the Interpleader Defendants.

**THE SECOND DISPUTE**

39. The second dispute relates to the first dispute and arises from the Wells Fargo Waiver Letter.

12

40. In the Wells Fargo Waiver Letter, Wells Fargo states that it waives all of its rights in respect of Interest Shortfall Payment Amounts "claimed or unclaimed but not previously paid to Wells Fargo arising in respect of the Calculation Period to, but excluding, the Floating Rate Payer Payment Date falling on May 25, 2011 . . . ."[2]

41. In the MBIA Third Letter, MBIA asserts that the waiver set forth in the Wells Fargo Waiver Letter is ineffective because Wells Fargo failed to comply with the waiver provision in the Schedule to the Wells Fargo Credit Default Swap which requires that (i) any waiver be evidenced in writing executed by each party to the Wells Fargo Credit Default Swap, and (ii) the Rating Condition be satisfied.

42. In the Wells Fargo Response, Wells Fargo rejects MBIA's position on the waiver on several grounds. Wells Fargo (i) characterized its notice as "a release of payment by the Issuer of the Interest Shortfall Payment Amounts described in the notice as being owed to Wells Fargo," (ii) challenged MBIA's right to even raise the issue because MBIA is not a party to the Wells Fargo Credit Default Swap, and (iii) asserted that the concept of effectiveness refers to the enforcement of rights and not to the mere release of a party's payment obligation.

43. In the MBIA Fourth Letter, MBIA disputes Wells Fargo's characterization of the Wells Fargo Waiver Letter as effectuating a "release," and states that, in any event, there is no substantive difference between a release and a waiver. The MBIA Fourth Letter thus states that the Wells Fargo Waiver Letter is ineffective for the reasons set forth in the MBIA Third Letter.

---

[2] Upon information and belief, the Wells Fargo Waiver Letter covers Interest Shortfalls payable on Fixed Rate Payer Payment Dates from February 25, 2011 through May 25, 2011 (the "Additional Interest Shortfalls").

13

44.     By waiving the Interest Shortfall Payment Amounts to which it otherwise would be entitled, Wells Fargo renders moot two of the arguments made by MBIA in the MBIA First Letter; namely MBIA's assertion that: (i) Wells Fargo failed on a timely basis to make calculations of Interest Shortfall Payment Amounts and/or to provide notice thereof, and (ii) funds in the Reserve Account should not be used to pay such amounts. If MBIA's position with respect to this waiver issue is sustained, however, MBIA would preserve those arguments for the relevant Distribution Dates. In addition, as noted above, if MBIA ultimately prevails on the issues raised in the MBIA First Letter, the Trustee may be unable to make the Super Senior Swap Premium Payments to LaCrosse.

45.     The second dispute among the Interpleader Defendants thus relates to the scope of a waiver provision in the Wells Fargo Credit Default Swap. As evident from the positions of MBIA and Wells Fargo, the particular language of the waiver provision is subject to different interpretations. The Trustee is unable to determine which of the parties is correct in this dispute on the basis of the plain language of the provision in issue, and therefore requests that the Court resolve this dispute among the Interpleader Defendants.

## THE THIRD DISPUTE

46.     The third dispute in this action concerns MBIA's assertion in the MBIA First Letter that the Collateral Manager (acting on behalf of the Issuer) breached the terms of the Indenture by withdrawing funds from the Reserve Account to make payments to Wells Fargo under the Wells Fargo Credit Default Swap on the date specified in such direction.

47.     MBIA contends that such payments to Wells Fargo from funds withdrawn from the Reserve Account constituted a breach of the terms of the Indenture because the payments

14

were not made on a Fixed Rate Payer Payment Date. MBIA relies on the provisions in the Wells Fargo Credit Default Swap which provide that (i) Interest Shortfall Payment Amounts are required to be paid on Floating Rate Payer Payment Dates, and (ii) each Floating Rate Payer Payment Date occurs on the first Fixed Rate Payer Payment Date falling at least two Business Days after the delivery of the requisite calculation notice relating to an Interest Shortfall Payment Amount. According to MBIA, even if funds from the Reserve Account are used to pay Interest Shortfall Payment Amounts, such payments should be made on a Fixed Rate Payer Payment Date.

48.     Wells Fargo and the Collateral Manager disagree with MBIA in respect of the use of funds in the Reserve Account. In contrast to MBIA which relies on the terms of the Wells Fargo Credit Default Swap, Wells Fargo and the Collateral Manager rely on Section 10.6(b) of the Indenture which provides, in pertinent part, that "the Issuer may direct the Trustee to make a withdrawal from the Reserve Account on any Business Day . . . to pay (1) any [Interest Shortfall Payment Amount] (to the extent that Interest Proceeds . . . are insufficient for such purpose) . . . ."

49.     The applicable provisions of the Indenture and the Wells Fargo Credit Default Swap thus appear to be in direct conflict, as reflected by the conflicting positions of the Interpleader Defendants. The Trustee therefore requests that the Court resolve this third dispute among the Interpleader Defendants.

## THE FOURTH DISPUTE

50.     The fourth dispute in this action was also raised by MBIA in the MBIA First Letter.

15

51. In the MBIA First Letter, MBIA states that "[i]t is MBIA's understanding that [Wells Fargo] persuaded the Collateral Manager to designate amounts in the Expense Account as Interest Proceeds . . . in order to make such amounts available for distribution on the Applicable Indenture Distribution Date." MBIA therefore "requests" that the Collateral Manager cease making such designations because such action allegedly "depletes the Issuer of amounts that it could potentially use in the future to make principal payments to the Noteholders." MBIA also asserts that it is "improper" for the Collateral Manager to take direction from Wells Fargo in performing its obligations and requests that the Collateral Manager cease to accept such directions in the future.

52. Wells Fargo and the Collateral Manager, on the other hand, note that Section 10.4(a) of the Indenture vests the Collateral Agent with the sole discretion to designate amounts in the Expense Account as Interest Proceeds or Principal Proceeds. Section 10.4(a) of the Indenture provides, in pertinent part, that "[t]he amount on deposit in the Expense Account may, at the option of the Collateral Manager, in its sole discretion, be designated as Interest Proceeds or Principal Proceed." Wells Fargo and the Collateral Manager rely on that provision as being dispositive of the issue.

53. The Collateral Manager further contends that it exercised its discretion appropriately pursuant to Section 10.4(a) of the Indenture, in the best interest of the Issuer, and in accord with the governing standard of care in the Collateral Management Agreement.

54. A dispute thus exists as to the scope of the discretion of the Collateral Manager to designate funds in the Expense Account as Interest or Principal Proceeds, with MBIA contending

16

that there are, in fact, limits on such discretion. The Trustee respectfully requests that the Court resolve this issue as well.

## PRAYER FOR RELIEF

**WHEREFORE**, U.S. Bank respectfully asks the Court:

A. To order the Interpleader Defendants to interplead and to settle all claims to the Disputed Funds among themselves and any other person who claims or may claim an interest, beneficial or legal, in such proceeds;

B. Pending such final judgment, to enjoin the Interpleader Defendants and all claiming through or acting with them, or anyone claiming any interest in the Disputed Funds, from commencing or prosecuting any separate proceeding against U.S. Bank concerning or relating to the issues in this action;

C. To discharge U.S. Bank from liability, conditioned upon its continued compliance with the orders and judgment of the Court with respect to the subject matter of this controversy;

D. To award U.S. Bank its fees and costs with respect to this action, including without limitation its fees and costs as a result of time incurred by the Trustee and the Trustee's legal fees and costs; and

E. To award U.S. Bank such other and further relief as the Court may deem just and proper.

17

Dated: New York, New York
June 21, 2011

Respectfully submitted,

JONES DAY

By: /s/
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan

222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Interpleader Plaintiff,
U.S. Bank National Association*

18